# Staunton

M. V. WILSON v. N. W. STOWERS AND NANNIE G. STOWERS.

September 21, 1933.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*J. Powell Royall,* for the plaintiff in error.

*N. Clarence Smith,* for the defendants in error.

EPES, J., delivered the opinion of the court.

This is an action, instituted by notice of motion for judgment, brought by Miss M. V. Wilson against N. W. Stowers and his wife, Nannie G. Stowers. The notice alleges that the defendants are indebted to the plaintiff for the full amount evidenced by a note for $1,800 dated January 27, 1927, drawn and executed by N. W. Stowers and Nannie G. Stowers, payable to the order of M. V. Wilson twelve months after date, with interest from date.

The defendants filed a plea of *nil debet* and a special plea of payment, alleging that "on the _____ day of _____, 19___, the said defendants paid to the said plaintiff the said sum of $1,800 together with interest thereon."

The case was tried twice before a jury. On the first trial there was a hung jury. On the second trial the jury returned a verdict for the defendants, in accordance with

which the court entered judgment. To this judgment the plaintiff assigns error.

■ The first assignment of error relates to the court's overruling the objections made by the plaintiff to the defendant's pleas.

When the plaintiff made her objections to the pleas she stated no reason therefor, and the court overruled the objections. However, after the verdict had been returned and judgment entered, her counsel stated to the court that she had objected to the pleas for the following reasons: (1) The pleas were not signed by counsel, and the names of the defendants signed thereto were written with a typewriter. (2) The plea of payment did not state "when the said defendants paid to plaintiff the said sum of $1,800, together with the interest thereon."

These objections could, and doubtless would, have been remedied if the grounds of objection had been stated when the objections were made. It is not permissible for a plaintiff to object generally to pleas and then after judgment to raise points such as are here made. See in this connection Rule 22 of this court. The court committed no error in overruling the objections to the pleas.

■ The second assignment of error is that the court erred in permitting the defendants to read to the jury the deposition of Ocie Sparks.

The objection made to the reading of this deposition was that there was no evidence sufficient to establish that Ocie Sparks fell within any of the classes of persons whose depositions may be read by one party to a civil case at law without the assent of the other party. Section 6231, Code Va. 1919, reads:

"A deposition in a civil case at law, taken on such notice, under sections sixty-two hundred and twenty-five, sixty-two hundred and twenty-six and sixty-two hundred and twenty-eight, may be read in such case if, when it is offered, the witness be dead, or out of this State, or one of its judges, or a superintendent of a hospital for the insane distant more than thirty miles from the place of trial, or

in any public office or service, the duties of which prevent his attending the court, or be unable to attend it from sickness or other infirmity, or be more than a hundred miles from the place of trial. But where the only ground of reading a deposition is, that the witness is more than a hundred miles from the place of trial, on motion to the court, before the commencement of the trial, it may, for good cause shown, require such witness to attend in person."

It is not contended that Ocie Sparks was at the time of the trial as far as one hundred miles from the town of Tazewell where this case was tried. The defendants' contention that her deposition was admissible is based solely upon the following testimony contained in her deposition:

"Q. Can you get to Tazewell court tomorrow?

"A. No, sir, I can't.

"Q. Why?

"A. Because I have a sick sister that has to take treatment, and no one here can give the treatments but me.

"Q. If it were not for that condition you would be perfectly willing to come to Tazewell as a witness in this case?

"A. Yes, sir.

"Q. Have you been requested by Mr. Stowers to attend court at Tazewell as a witness?

"A. Yes, sir.

"Q. And have you told him that you would do so, except for your sister being in the condition that she is in?

"A. Yes, sir."

This testimony is not sufficient to render her deposition admissible under the provisions of section 6231. We are not able to say that the plaintiff was not prejudiced by the reading of this deposition, and are of opinion that the court committed reversible error in permitting it to be read.

Having reached this conclusion, the question arises, What judgment should be entered here? Section 6365, Code Va. 1919.

The defendants pleaded *nil debet* and the plea of payment heretofore quoted, but the defense which they asked the court to submit to the jury in the instructions asked for by them was that the note sued upon was executed and delivered to Miss M. V. Wilson without any consideration to them therefor, and is, therefore, unenforceable in her hands.

In reply to a question asked by the writer, counsel for defendants stated at the bar of this court that there was no contention that this note had been paid since it was executed and delivered to Miss Wilson. In view of this admission we deem it unnecessary to discuss the issue raised by the plea of payment, further than to say that the evidence is insufficient to support a verdict based upon a finding that, since it was executed and delivered, the note has been paid to Miss Wilson, or any one for her, by the defendants, or anyone else, we shall, therefore, confine our consideration of the evidence to the question, Was the note given for a consideration which will support a recovery thereon by Miss Wilson?

It appears from the evidence that the background against which this litigation is projected is this:

Mary V. Wilson has a daughter, Lula Mae Wilson, who was born in February, 1903. While still a minor, in December, 1918, she married E. C. Dutton. When Lula Mae was nine years old, Samuel Henigar died, leaving a will by which he devised to her about 2,375 acres of land in Tazewell and the adjacent counties.

Three hundred and twenty-three (323) acres of the land in Tazewell county, known as the Henigar place, lie in the bowl-like valley in the Alleghany mountains known as Burk's Garden, which is famous for its beauty and the great fertility of its soil. Another large area of this land lies on the mountain by which Burk's Garden is almost completely enclosed. The 323-acre place is divided into two tracts by a road. One of these contains 173 acres and the other, on which there is a brick dwelling and other improvements, contains 150 acres.

By permission of her guardian given in pursuance of an order of the court, Lula Mae and her mother occupied the dwelling on the 150-acre tract as their home until Lula Mae's marriage. What use was made of the land during this period does not appear from the record. After her marriage the court appointed her husband receiver of her property in accordance with the provisions of what is now section 5136, Code Va. 1919. From that time until 1924, when she became twenty-one years of age, Mrs. Dutton and her receiver permitted her mother to occupy the dwelling on the 150-acre tract as her home, and after she became of age she continued to permit her mother to occupy the dwelling.

From 1920, to and including 1931, N. W. Stowers rented both the 173-acre tract and the 150-acre tract, but he did not have the use or occupancy of the dwelling on the 150-acre tract until 1927. From 1920, to and including 1926, Miss Wilson occupied the dwelling alone; but in 1927 Stowers and his family moved into the dwelling, and from that time until he moved away in December, 1931, Miss Wilson lived there with them.

Throughout the whole period 1920-1931, Stowers rented the 173-acre tract from E. C. Dutton, first renting from him as receiver for his wife and then from him as her agent. About this fact there is no dispute.

In considering the evidence relating to from whom Stowers rented the 150-acre tract during the period 1920-1931, it is necessary to view it as divided in three periods (1) 1920-1923, (2) 1924-1925, and (3) 1926-1931. For each of the years 1920-1923 Stowers rented it from E. C. Dutton as receiver for his wife; and for the years 1926-1931 he rented it from Dutton as agent for his wife. But Mrs. Dutton testified that throughout the whole period, 1920-1931, her mother was entitled by gift from her to the rent which came from the 150-acre tract, and that in renting it to Stowers during the period 1920-1923 and the period 1926-1931 her husband was renting "what my mother had" as "I gave her permission to rent it." There is a sharp

conflict in the evidence as to from whom Stowers rented the 150-acre tract for the years 1924 and 1925.

Stowers testified that he rented both the 150-acre tract and the 173-acre tract from Dutton in 1924 and 1925 just as he had theretofore done and thereafter did; that he did not rent it from Miss Wilson and had no dealings with her with reference to renting it; that he had paid to E. C. Dutton the full amount of the rent for both tracts for each year 1920-1931; and particularly that he paid to E. C. Dutton the rent for the 150-acre tract for 1924 and 1925. He testified further that under the rent agreements made by him with Dutton, he was to pay the taxes on all Mrs. Dutton's land in Tazewell county and to receive credit on his rent for the taxes paid by him. It may be noted, however, that he was not able to remember what was the amount of rent agreed to pay, or paid, for either the 150-acre tract or the 173-acre tract, or for the two together, in 1924 or 1925, or any other year.

The testimony of Miss Wilson and her daughter, Mrs. Dutton, is to this effect: During her minority Mrs. Dutton had given her mother the right to have the rent from the 150-acre tract for her own benefit. She became of age in February, 1924, and soon thereafter Mrs. Dutton gave her mother "permission to rent it to whom she wanted for 1924 and 1925," and the right to collect the rent and have and use it for her (Mary V. Wilson's) own benefit. Acting upon this authority, Miss Wilson rented the tract to Stowers for 1924 and again for 1925. According to Miss Wilson's statement she rented the tract to Stowers for $600 a year with the understanding that he was also to pay the taxes on it. Mrs. Dutton testifies that her mother rented it to Stowers for $600 a year, but says nothing about the taxes.

E. C. Dutton testified to the following effect on these points: With the exception of 1924 and 1925, he rented both the 173-acre tract and the 150-acre tract to Stowers. In 1924 and 1925 he rented to him the 173-acre tract, but

he did not rent the 150-acre tract to him for either of those years. Under the rent agreements he made with Stowers it was understood that Stowers would pay the taxes on all the land in Tazewell county belonging to Mrs. Dutton and that he should receive credit on his rent for the taxes paid. Stowers has paid to him the rent for both tracts for 1920-1923, the rent for the 173-acre tract for 1924 and 1925, and for both tracts from 1926 to 1928; but has not paid to him any rent for the 150-acre tract for the years 1924 and 1925. Stowers paid the taxes on all Mrs. Dutton's land in Tazewell county for each year 1920-1931, and was given credit for these taxes on the rent for the land that he (Dutton) rented to him. After having been credited with all taxes paid by him, Stowers owes Mrs. Dutton for rent for 1928 and succeeding years as much as $1,500, which is entirely distinct from and in addition to the $1,800 he owes Miss Wilson. Soon after Mrs. Dutton became of age, she gave her mother the right to rent the 150-acre tract for her (Miss Wilson's) own use and benefit; and Miss Wilson rented it for the years 1924 and 1925 to Stowers. He did not know of his own knowledge for what rent Miss Wilson rented to Stowers, but understood it was $600 a year.

This brings us to the testimony of Miss Wilson on the one hand and the defendants on the other as to the facts and circumstances of the execution and delivery by the defendants to Miss Wilson of the $1,800 note here sued upon.

Mrs. Nannie G. Stowers testified that she knew nothing about the giving of the note other than that her husband brought it to her and she signed it.

Miss Wilson's testimony is this: In January, 1927, Stowers had not paid her the rent for the 150-acre tract for either 1924 or 1925, and still owed her, exclusive of interest, $1,200 on this account. At that time she also held two notes which Stowers had given her for money she had loaned him in 1924 and 1925, on which notes he had paid

no interest. One of these notes was for $150 and the other for $300. He also owed her some money for work which she had done for him. In settlement of these items of indebtedness he gave her the $1,800 note here sued upon. In January, 1929, and again in July, 1930, she asked him to pay the note, but each time he said he was unable to do so. When in the fall of 1931 she asked him to pay her the note, he said that if she "had to have the money he would have to make a sacrifice and pay it," but he did not do so; and both the principal and interest of the note remain wholly unpaid.

Stowers' account we give in his own words:

### Direct Examination.

"Q. The plaintiff has introduced in evidence a note here signed by you and your wife for $1,800, please state to the jury the facts with reference to the execution of that note and what happened?

"A. Miss Wilson, as they have stated here, claimed this land on the south side of the road as her land and they contended that it was; they were just letting her live on the place, then they contended the other way. They said they would take care of the note, that they couldn't afford to let her bank money on them and they borrowed money to live on.

"Q. The note was given to Miss Wilson on her claim that the land was hers to rent, but actually who did you rent the land from and who did you pay?

"A. I paid Mr. Dutton.

"Q. And rented it from him?

"A. Yes, sir.

"Q. What did Mr. Dutton tell you with regard to the note?

"A. Why, he said he would take care of the note, that they wouldn't bother me.

"Q. Do you remember an occasion when Garland Henigar and you were present at the home of Mr. Dutton a little over a year ago [*i. e.*, in the fall of 1931]?

"A. Yes, sir.

"Q. At that time were you and Mr. Dutton talking about this note?

"A. Yes, sir.

"Q. Please state to the jury whether or not at that time in the presence of Garland Henigar, Mr. Dutton told you not to worry about this $1,800 note, that it had been paid and he (Dutton) would destroy it?

"A. He did."

### Cross-Examination.

"Q. Had you ever asked Mr. Dutton about the note before?

"A. Certainly.

"Q. Why didn't he give it to you?

"A. Because he couldn't get the note from her to turn it over to me.

"Q. Couldn't get it—the note was hers, wasn't it?

"A. The note was given to her.

"Q. What was the note given to her for?

"A. Claimed the rent of this land was taken from her.

"Q. For how many years?

"A. Well, I don't just recall the exact number of years it was given for.

"Q. Was it given for one year?

"A. No, it wasn't for one year.

"Q. Two years?

"A. For more than two years.

"Q. How much a year?

"A. Well, the land was worth about $250 a year.

"Q. I am not asking you the worth—how much did you agree to pay Miss Wilson each year for that land?

"A. Well, about $250.

"Q. $250 a year for the rent of the land?

"A. I think so.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. You think you were to pay about $250 a year rent for that land?

"A. Yes, sir.

"Q. How do you make up the $1,800, for what years and for what amounts?

"A. Well, I just don't exactly recall the exact articles that consisted the $1,800—some of it she claimed for some rents—and well, I think she claimed a little of it for money—seems like I got, as well as I remember, $155 in money from her at one time.

"Q. How many years did you have the land rented before you gave this note?

"A. I had the land rented from 1920 on up to 1931.

"Q. Who did you pay the rent to up to 1924?

"A. To Mr. Dutton.

"Q. To Mr. Dutton?

"A. That is the rentals, this note was to cover some money that went to her before 1924.

"Q. Who did you pay the rentals up to 1924?

"A. Supposed to be in that note.

"Q. That doesn't answer the question, who did you pay the rent up to that time—1924?

"A. Supposed to be in that note.

"Q. If you were renting from Dutton, why were you giving the note to Miss Wilson?

"A. She claimed this rent all the way along—claims it today.

"Q. Who did you pay the rent to on the land for 1924, has it ever been paid?

"A. Yes, sir.

"Q. Who did you pay it to?

"A. For 1924, its been paid to Mr. Dutton.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. Why would you pay it to Mr. Dutton when you had given a note for it?

"A. At that time there wasn't any note given for it.

"Q. No note was given until 1927?

"A. Certainly.

"Q. Why did you give Miss Wilson a note for the rent, if you had paid Mr. Dutton in 1924?

"A. I did not do that, I paid it to Mr. Dutton for 1924.

\*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Who did you pay the rent on this land to for the year 1925?

"A. Paid it to Mr. Dutton.

\*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Now, explain to the jury why you gave a note to M. V. Wilson, you and your wife, for $1,800 on January 27, 1927, if you had already paid this rent to Mr. Dutton for the years 1924 and 1925?

"A. Well, as I told you, it was for some stuff prior to that she controlled.

"Q. What stuff prior to that?

"A. This land for 1920 up to '24.

\*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Now, tell the jury what explanation you make why you shouldn't pay the note at that [sic, this] time?

"A. Mr. Dutton demanded the money to be paid them.

"Q. You didn't pay it to him though, did you?

"A. Yes, sir.

"Q. You mean you paid Dutton this note?

"A. That note was included in the payments made to Mr. Dutton for rent.

"Q. Then why didn't you take up the note?

"A. I couldn't get the note.

\*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Did you take a receipt from Dutton at the time you paid this note?

"A. He promised to get me the note.

"Q. How much did you pay him?

"A. The $1,800—not all at one time—included in rent from time to time.

\*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. You never entered into any rental contract with Miss Wilson at all?

"A. No, sir.

"Q. But you did sign the note to her?

"A. Yes, sir, that note was executed to her.

"Q. You and your wife both signed the note—no question as to signature?

"A. No, sir, no question as to signature—to keep down family trouble this note was issued to her.

"Q. You are willing to give your note for $1,800 to buy family peace for other people, is that right?

"A. With the understanding that this note was to be taken care of by those other people.

"Q. Who was to pay the note?

"A. The note was to be returned to me.

"Q. It wasn't to be paid?

"A. That was with them what they did with it.

"Q. Well, if Dutton and his wife never paid Miss Wilson this note, she hasn't been paid, has she?

"A. Well, I paid it to them, I can't say what they did; I have no authority if they did.

"Q. After you executed this note to Miss Wilson, or before, did she ever authorize you to pay Dutton and his wife anything for her?

"A. Not that I know of."

### Redirect Examination.

"Q. You stated in answer to some questions by Mr. Royall that this note was given sorta for a means of patching up some family differences that were existing there, just tell the jury what you mean by that, just tell the facts as to what went on there with regard as to who the money on the rent of this land was to go to, and what you know about it?

"A. Well, they were two tracts of land, one on the north and one on the south side of the road, and while Mr. Royall was receiver, the court as I understood, gave per-

mission and that land there was turned over there by the court for Miss Wilson and Miss Lula Mae Wilson, and of course, after Mr. Dutton was married Miss Wilson, of course, and does yet today I suppose, or did the last time I heard her say anything about it, claimed this land.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. Now, you got up to the year 1927, what happened that caused this note to be executed?

"A. Well, she got to raising some sand about getting some rentals that she was due some money, why, I said Mr. Dutton, I can't pay any more rent than I was paying, if I was forced to pay more rent he would have to get somebody else, and he said do this and he would take care of it, and it wouldn't bother me at all.

"Q. Then the only conversation that you had with reference to rental was in 1927 in so far as Miss Wilson was concerned?

"A. Yes, sir.

"Q. And in order to keep down trouble between the Dutton and Wilson families, Mr. Dutton asked you to give this note and he would take care of you and destroy it?

"A. Yes, sir.

"Q. But no rent was ever due Miss Wilson at any time, was there?

"A. No, sir."

### Re-Cross-Examination.

"Q. Then the note you gave Miss Wilson for $1,800 sued on in this case bought peace between Dutton and his wife and her—that was what you call a peace note, is that correct?

"A. You can term that as you please—any way you think so far as I know.

"Q. You said a while ago in response to Mr. Smith's question that it was to keep down trouble in the family?

"A. It was."

If the testimony of Miss Wilson and Mr. and Mrs. Dut-

ton be true, there can be no question that there was a full consideration for the giving of the note sued upon.

Stowers' version of how he came to give Miss Wilson the note reduces itself to this: Dutton, acting first as receiver for his wife and then as her agent, had been renting the 150-acre tract to him for the years 1920-1926, and he had paid Dutton the rent for this tract for each of those years. Miss Wilson was making a claim that she was entitled to have Dutton pay over to her the rent for the 150-acre tract for 1924 and 1925, and also certain other sums collected by him for the rent of it for years prior to 1924. The basis of Miss Wilson's claim against Dutton was that Mrs. Dutton had given her the right to have the rent derived from this tract paid to her (Miss Wilson) for her own use and benefit (in which claim she is unqualifiedly supported by her daughter's testimony); and she was "raising some sand" because Dutton had not paid over to her the rents collected by him for this tract. In this state of affairs, Dutton to pacify and settle with Miss Wilson, either in whole or in part, for what she claimed she was entitled to be paid by him (Dutton), and to avoid having to pay her any cash at that time, requested Stowers to give Miss Wilson the note here sued upon. Though Stowers did not owe Miss Wilson any money, had paid to Dutton all the rent that he owed him as agent for his wife, and received no consideration for so doing, he did as Dutton requested, relying on Dutton's promise that "he would take care of the note, and that they wouldn't bother" him (Stowers), and with the understanding that this note was to be "taken care of by those other people," that is, the Duttons. In other words, Stowers and his wife executed and delivered the note to Miss Wilson for the accommodation of Dutton.

Section 5591, Code Va. 1919 (section 29, N. I. L.), reads as follows:

"An accommodation party is one who has signed the instrument as maker, drawer, acceptor, or indorser without receiving value therefor and for the purpose of lend-

ing his name to some other person. Such a person is liable on the instrument to a holder for value notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party."

The law on this subject is well stated in 3 R. C. L. p. 927, where it is said: "No consideration moving to one who becomes a party merely for accommodation is necessary to support his contract. To fasten liability upon an accommodation indorser it is not necessary that any consideration should move directly to him. The contract of such indorsement is supported by the consideration moving to the payee from the person to whom he negotiates the instrument. Nor is any consideration moving to the accommodation maker necessary to uphold an accommodation note; the consideration which supports the promise of the accommodation maker is that parted with by the person taking the note and received by the person accommodated."

Under the facts testified to by Stowers, if E. C. Dutton had given Miss Wilson his note for $1,800 instead of giving her, or having Stowers give her, the note here sued upon, it would have been given for a consideration sufficient to support a recovery thereon. This being true, the defendants cannot defeat a recovery by Miss Wilson on their note by showing that they executed and delivered the note to Miss Wilson without consideration to them therefor.

Our conclusion is that the judgment of the court should be reversed and judgment here entered for the plaintiff in error for the full amount sued for.

*Reversed.*